# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GOLDENTREE ASSET             )
MANAGEMENT LP,               )
                             )
    Plaintiff,         )
                             )
    v.                 )    No. 13 C 00435
                             )
BNP PARIBAS S.A.; SCHMOLZ +  )    Judge John J. Tharp, Jr.
BICKENBACH LUXEMBOURG S.A.;  )
SCHMOLZ + BICKENBACH AG,     )
                             )
    Defendants.        )

## MEMORANDUM OPINION AND ORDER

In 2012, GoldenTree Asset Management LP ("GoldenTree") purchased more than $50 million in bonds from the defendants in this case, Swiss company Schmolz + Bickenbach AG ("S+B AG"), Luxembourg company Schmolz + Bickenbach Luxembourg ("S+B Luxembourg") (collectively referred to herein as "S+B"), and French company BNP Paribas S.A. ("BNP"), the underwriter of the bonds. GoldenTree now accuses the defendants of fraud, alleging that while marketing the bonds for sale, they trumpeted the expertise and track record of the issuer's management team while concealing the intention to fire that very team. According to GoldenTree, S+B followed through on that intention and fired the team less than two months after the bond offering closed, triggering a loss of as much as 10 percent of the bonds' market value. The defendants move to dismiss the case on several grounds. The Court concludes that it lacks personal jurisdiction over the S+B defendants and that in any event the case should be dismissed on the basis of *forum non conveniens*.

## I.   Background

### A.  Factual Background[1]

The plaintiff, GoldenTree, is an investment management limited partnership organized under Delaware law with its primary place of business in New York. It also has offices in other cities around the globe, including London. This case arises from GoldenTree's purchase of more than $50 million in bonds based on the representations of the three defendants. The first defendant, S+B AG, is a global steel manufacturer that is incorporated in and has its primary place of business in Switzerland. In the spring of 2012, S+B AG owed creditors nearly €875,000,000 repayable in full no later than April 30, 2015. At the time, Europe was experiencing a debt crisis in which European banks were reluctant to lend to underperforming European companies experiencing debt. This posed a significant challenge to S+B AG when it came to raising money or refinancing its existing debt, which, in turn, motivated S+B AG to initiate an offering of €300,000,000 in Senior Secured Notes (the "Notes") to exchange a portion of its short-term debt for debt of a longer duration.

The second defendant, S+B Luxembourg, is a wholly owned subsidiary of S+B AG formed for the sole purpose of issuing the Notes. It is incorporated in and maintains its primary place of business in Luxembourg. With no alternative revenue streams or assets outside the Notes proceeds, S+B Luxembourg is wholly dependent on S+B AG and its subsidiaries to generate the funds needed to service the Notes' principal and interest payments.

The third defendant, BNP, is incorporated in and maintains its primary place of business in France. It provides global retail, commercial, and investment banking services, including via a

---

[1] As it must when evaluating a motion to dismiss, the Court accepts all well-pleaded factual allegations as true for the purposes of this motion and draws all reasonable inferences in the plaintiff's favor. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). The following facts are accordingly taken from the Complaint. Dkt. 1-1.

branch office in Chicago, Illinois. BNP was the primary agent that marketed the Notes to investors and was one of S+B AG's largest creditors prior to the offering. The offering was structured so that BNP initially purchased the Notes as an underwriter and then resold them to investors.

Offering and roadshow materials used to market the sale of Notes to potential investors described the purpose of the offering as diversifying S+B AG's funding structure and extending its maturity profile. The materials emphasized S+B AG's strong senior management team, consisting of Chief Executive Officer ("CEO") Benedict Niemeyer and Chief Financial Officer ("CFO") Axel Euchner. They described the talent and experience of this leadership team as a key business asset; the materials included multiple detailed statements regarding their individual and collective years of industry experience, prior track record implementing strategy, and previous experience responding to periods of global economic crisis. The team was touted as one of four "key investment highlights"; the risk of losing Niemeyer and Euchner was identified, in turn, as a potential investment risk. The materials did not disclose any intention to terminate the CEO and CFO of S+B AG, or even the possibility that such a termination was imminent. They also did not disclose how much of S+B AG's debt was held by BNP or the extent to which BNP stood to benefit from the offering as a result of the proceeds being used to retire a portion of S+B AG's existing debt.

On April 24, 2012, BNP contacted GoldenTree in London to gauge GoldenTree's interest in participating in the offering. Shortly thereafter, GoldenTree's London representatives contacted GoldenTree's U.S.-based portfolio manager in the New York office, Jeffrey Burke, to evaluate the potential deal. Burke and others in the New York office commenced their due diligence on S+B AG's financial condition, business prospects, and proposed financial terms. On

April 25, 2012, BNP arranged a meeting between potential investors and S+B AG's management team (including the CEO and CFO); GoldenTree was represented by Burke, who participated from New York via telephone. In advance of the April 25 meeting, GoldenTree representatives in the United States were given access to the aforementioned roadshow materials summarizing the offering and the company. During the meeting, the CEO and CFO personally presented on S+B AG's business model and global leadership position, including describing more than $400 million in revenue from North American operations.

Burke requested, and BNP arranged, a follow-up call between GoldenTree and S+B AG's CEO, CFO, and Chief Operating Officer on April 30, 2012. During the call, which lasted approximately one hour, they discussed a range of issues including S+B AG's historical performance, financial reporting, future financial projections, and details concerning the financial terms of the offering. Neither BNP nor S+B AG disclosed any issues between S+B AG's leadership team and its board of directors, nor did they provide any indication that the CEO and CFO did not intend to remain with S+B AG through the duration of their contracts (through 2014) and beyond.

On May 11, 2012, GoldenTree purchased €40m in Notes. The decision to purchase was made in GoldenTree's New York office and was authorized by Burke. The trade was also executed and recorded in the New York office. GoldenTree based its decision to purchase the Notes on the track record and experience of S+B AG's management team as it was described in the marketing materials and other communications.

Less than two months later, on June 18, 2012, S+B AG issued a press release announcing that its board of directors had unanimously agreed to terminate the CEO and CFO. It stated:

> Since [S+B AG] . . . carried out its capital increase in May
> 2010, public shareholders have held the majority of the company's

> capital. In the meantime the Board of Directors, under the chairmanship of Hans-Peter Zehnder since the beginning of the year, has introduced changes to corporate governance in order to take account of these shareholders' rights to transparency and codetermination. This includes a reorientation of the management structure and the corporate culture. Against this background the Board of Directors has unanimously agreed to transfer management of the company to a new generation of managers.
>
> It has therefore decided not to extend the employment contracts of [the CEO and CFO].

The release stated that no permanent replacement had been identified for either terminated individual; the Chief Operating Officer would act as CEO on an interim basis. Market reaction to the press release was "immediate and categorically negative." The Notes lost as much as 10 percent of their market value.

GoldenTree alleges that the press release provided "no meaningful explanation" for the decision and that membership on the board did not change in between the date of the offering and the date that the press release was issued (which might have explained the board's apparent change in how it viewed the CEO and CFO). Later disclosures suggested that the termination decision was related to the company's transition to public control in May 2010 and Zehnder's transition to Chairman in December 2011. An article in *CFO Insight* published the day after the press release was issued, June 19, 2012, quoted Zehnder as stating that the CEO and CFO no longer fit with S+B AG after control of the company was transferred from its founding family to the public (that is, in May 2010). Zehnder was quoted as referring to "some major differences in the views on how to manage the company and to bring it to the next level." Similar issues were mentioned in an August 22, 2012, earnings release, which stated that the CEO and CFO were terminated in connection with Zehnder's efforts to "improve" "corporate governance" after he took over as Chairman in December 2011.

In response to the June 18 press release, GoldenTree portfolio manager Lucy Panter emailed BNP salesperson Robb McGregor to ask whether BNP and S+B AG were going to further explain the board's decision to investors. McGregor emailed Panter, Burke, and other GoldenTree employees, stating that "as far as we have been communicated, this appears to be a political situation between the Board and the CEO/CFO. . . . NO fraud issues and NO operational issues/concerns." BNP organized an investor call on June 19, 2012, to address concerns about the press release and the impact on S+B AG's business. On the call, Zehnder advised investors that the terminations were motivated by a political dispute and also stated that the terminated individuals lacked the "honesty, integrity and ethics" that the company wanted in its senior management. Zehnder insisted that the terminations were unrelated to the company's operations and financial performance and affirmed that the financial information provided in the offering materials remained accurate. GoldenTree sought further assurances after the investor call, and BNP salesperson Stanford Hartman arranged a private call between Burke and portfolio manager Vijay Rajguru for GoldenTree and Zehnder and new S+B AG management for S+B AG. S+B AG's new management team reaffirmed that the termination was unrelated to the company's operations and that trends in the company's business were in line with the information contained in the materials used to market the offering.

On August 22, 2012, S+B AG announced its financial results for the six-month period ending June 30, 2012. Its revenues and earnings were "dramatically lower" than described in the offering materials, including marked drops in EBITDA, operating profit, and net income. In explanation, the release noted decreased demand and uncertainty related to the global financial crisis during the period of January through June 2012 as reasons for the decline; these trends were not mentioned in the offering materials used to promote the offering to potential investors

through May 11, 2012. The release also mentioned the "restructuring" of the company. Shortly

after this release of the financial results, the Complaint alleges, the Notes declined another 10

percent in value.

S+B AG has two other subsidiaries (among more than 75 global subsidiaries) that are

relevant to the jurisdictional question, though not to the substance of GoldenTree's claims. S+B

AG's subsidiaries include non-parties S+B USA, Inc. ("S+B USA") and A. Finkl & Sons Co.

("A. Finkl"). GoldenTree alleges that S+B USA serves as S+B AG's North American

headquarters;[2] it is incorporated in and maintains its primary place of business in Chicago,

Illinois. In 2007, S+B AG acquired subsidiary A. Finkl, which is incorporated in Delaware and

maintains manufacturing business operations in Chicago. After the acquisition, S+B AG began

construction of a new A. Finkl manufacturing plant on the south side of Chicago that was

expected to employ 300 Chicago-area workers. S+B AG expected the plant to increase

production by 40 percent over five years. According to the Complaint, "the Illinois operations of

A. Finkl and S+B USA are an integral part" of S+B AG's worldwide business. Cmplt. ¶ 19.

Though the Complaint provides imperfect data for the purpose, based on the data provided it

appears that the Illinois subsidiaries contributed something on the order of four to five percent of

S+B AG's revenues in the next several years following the A. Finkl acquisition,[3] and also helped

S+B AG counter uncertainty in the European market associated with the international economic

crisis. The Complaint alleges that the Illinois subsidiaries are among the group of guarantors on

---

[2] S+B has effectively rebutted this claim. *See* Dkt. 33-3 at ¶ 18; *infra* note 6.

[3] The Complaint alleges that in 2011, Chicago production facilities generated $261.6 million in revenue toward S+B AG's total revenues, estimated to be approximately €4 billion. At a $/€ exchange rate of 1.4, that would amount to approximately 4.6 percent of S+B AG's total revenues.

the Notes, but does not allege that any of their personnel played any role in the misrepresentations on which GoldenTree's claims are based.

### B. Procedural History

For reasons undisclosed by the record and which cannot be plumbed from the mysterious depths of litigation strategy, GoldenTree filed this case in the Circuit Court of Cook County, Illinois, on December 13, 2012. The Complaint includes counts of common law fraud, fraudulent concealment, and fraudulent inducement against all of the defendants, and a count of negligent misrepresentation against BNP. On January 18, 2013, the defendants removed the case to this Court, where subject-matter jurisdiction is appropriate under 28 U.S.C. § 1332(a)(2). The defendants have filed two motions to dismiss the Complaint. The first of these motions, filed by S+B AG and S+B Luxembourg, argues that the case should be dismissed under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and under Rule 12(b)(5) for insufficient service. They also argue that the entire case should be dismissed based on the doctrine of *forum non conveniens* (in favor of the claims being litigated in Germany) and that the claims for fraud, fraudulent concealment, and fraudulent inducement should be dismissed pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim. BNP joins the S+B motion for dismissal on the basis of *forum non conveniens* and failure to state a claim, and also argues that the negligent misrepresentation claim asserted only against BNP should be dismissed for failure to state a claim.

After these motions were fully briefed, the Supreme Court issued its opinion in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In *Daimler*, the Court reversed a decision of the Ninth Circuit on which GoldenTree had relied in opposing the S+B defendants' challenge to personal jurisdiction. Accordingly, this Court accepted supplemental filings from the parties discussing

the effect of *Daimler* on the question of whether the Court has personal jurisdiction over the S+B defendants. The Court concludes that *Daimler* confirms and clarifies the law applicable to the exercise of general personal jurisdiction and requires dismissal of the claims against the S+B defendants. Alternatively, the Court concludes that it should dismiss this case based on the doctrine of *forum non conveniens*.

## II. Discussion

### A. Personal Jurisdiction

Personal jurisdiction refers to a court's "power to bring a person into its adjudicative process." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (quoting *Black's Law Dictionary* 930 (9th ed. 2009)) (internal quotation marks omitted). The scope of a federal district court's personal jurisdiction over a defendant in a diversity case is, in the first instance, defined by the jurisdiction of courts of general jurisdiction in the state where the district court is located. Fed. R. Civ. P. 4(k)(1)(A). Illinois permits its courts to exercise jurisdiction based on a variety of conditions not relevant here; for purposes of this discussion, it suffices to say that Illinois state courts may exercise jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. § 5/2-209(c). Thus, the scope of this Court's personal jurisdiction over S+B is, ultimately, defined by the Due Process Clause. If an Illinois court may constitutionally exercise personal jurisdiction over a defendant, it may do so—and so may this Court. *See N. Grain Mrktg.*, 743 F.3d, at 491-92.

As the Seventh Circuit has explained:

> The federal constitutional limits of a court's personal jurisdiction in a diversity case are found in the Fourteenth Amendment's due process clause, which protects an individual's liberty interest in not being subject to the binding judgments of a

> forum with which he has established no meaningful contacts, ties,
> or relations. A forum state's courts may not exercise personal
> jurisdiction over a nonconsenting, out-of-state defendant unless the
> defendant has certain minimum contacts with it such that the
> maintenance of the suit does not offend traditional notions of fair
> play and substantial justice. The nature of the defendant's contacts
> with the forum state determines the propriety of personal
> jurisdiction and also its scope—that is, whether jurisdiction is
> proper at all, and if so, whether it is general or specific to the
> claims made in the case.

*Id.* at 492 (citations and internal quotation marks omitted).

The plaintiff has the burden of establishing personal jurisdiction. *Id.* at 491. But here, the plaintiff makes no case at all for the exercise of specific jurisdiction—that is, jurisdiction predicated on some connection between the forum, the defendants, and the claims asserted. *See Daimler*, 134 S. Ct. at 754 (stating that specific jurisdiction exists when a suit "aris[es] out of or relate[s] to the defendant's contacts with the forum" (alterations in original) (citation and internal quotation marks omitted)). Arguments in support of personal jurisdiction can be waived, *see, e.g.*, *Williams v. REP Corp.*, 302 F.3d 660, 667 (7th Cir. 2002); *Steel Warehouse of Wis., Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998), and GoldenTree has waived this one, *see* Dkt. 39 at 10 (agreeing that "this is a general jurisdiction case" (citation and internal quotation marks omitted)).

Instead, GoldenTree argues only that this Court has general personal jurisdiction over the defendants. General, or "all-purpose," jurisdiction exists "where a foreign corporation's 'continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" *Daimler*, 134 S. Ct. at 754 (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)). The Court elaborated on the nature of the relationship required between a corporation and forum to establish general jurisdiction in *Goodyear Dunlop*

*Tires Operations, S.A. v. Brown*, where it explained: "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum State." 131 S. Ct. 2846, 2851 (2011) (quoting *Int'l Shoe*, 325 U.S. at 317). "*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler*, 134 S. Ct. at 760. Consistent with its use of the phrase "at home," in *Goodyear* the Court noted that domicile is the touchstone of general jurisdiction for both individuals and corporations, so a corporation's place of incorporation and principal place of business, which define its domicile, are the paradigmatic fora states in which a corporation should be deemed to be "at home." 131 S. Ct. at 2853-54. Although general jurisdiction is not limited to those states, it requires "an equivalent place." *Id.* at 2853. That is to say, as the Court subsequently elaborated in *Daimler*, that general jurisdiction "requires affiliations so continuous and systematic as to render [the foreign corporation] . . . comparable to a domestic enterprise in [the forum] State." 134 S. Ct. at 758 n.11 (first alteration in original) (citation and internal quotation marks omitted).

GoldenTree's original response to the defendants' motion failed to discuss the "at home" requirement for general personal jurisdiction and did not even cite *Goodyear*, the case in which the Supreme Court expressly articulated the standard. Instead, it invoked an "agency theory of general jurisdiction," asserting that this Court has general jurisdiction because the defendants have "continuous and systematic contacts" with Illinois by virtue of the fact that they are doing business in Illinois through their agents, the Illinois subsidiaries. Dkt. 39 at 10, 13 (asserting that a *prima facie* showing of general personal jurisdiction requires only that GoldenTree establish "that S+B is doing business in the United States through its Illinois subsidiaries"). As

GoldenTree described this agency theory, "a domestic subsidiary functions as its foreign parent's agent when it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id*. at 10 (quoting *Vikase Cos. v. World Pac Int'l AG*, 710 F. Supp. 2d 754, 761 (N.D. Ill. 2010)).[4]

That argument fails for two reasons. First, as the Supreme Court explained in *Daimler*, whether a foreign corporation has "continuous and systematic contacts" with a state is relevant to the existence of *specific*, not *general*, jurisdiction. 134 S. Ct. at 761. What matters to the general jurisdiction inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Id.* (alteration in original) (quoting *Goodyear*, 131 S. Ct. at 2851). General jurisdiction does not "exist[] whenever 'continuous and systematic' contacts are found." *Id*. Rather, the affiliation between the parent and the forum must be so continuous and systematic that the foreign corporation is "comparable to a domestic enterprise in that State." *Id.* at 758 n.11.

Second, in *Daimler*, the Court expressly rejected the agency theory that GoldenTree advanced in its response. In the district court and the Ninth Circuit, the plaintiffs in *Daimler* had maintained that because the services provided by Daimler's indirect subsidiary U.S. distributor were substantial and important to Daimler, it was acting as Daimler's agent and its contacts with the forum state (California) were therefore imputable to Daimler. This is the same argument

_____

[4] There is a threshold problem with the application of any agency theory to S+B Luxembourg: the company has no subsidiaries. See Dkt. 33-3 at ¶ 4. GoldenTree argues that S+B Luxembourg is the alter ego of S+B AG, and is therefore subject to general personal jurisdiction because S+B AG is subject to general personal jurisdiction. Because the Court concludes that S+B AG is not subject to general personal jurisdiction, there is no need to address the alter ego argument.

GoldenTree originally advanced in this case, *see* Dkt. 39 at 14 ("This Court has jurisdiction over S+B not because it '*has* subsidiaries' in Illinois . . . , but because those Illinois subsidiaries are essential components of S+B's business."), and GoldenTree cited the Ninth Circuit's opinion endorsing that view as precedent for its argument, *see* Dkt. 39 at 11. In reversing the Ninth Circuit, however, the Supreme Court rejected the notion that the "importance" of a subsidiary's activities to a parent corporation is the measure of when that subsidiary should be deemed to be the agent of the parent corporation for jurisdictional purposes, observing that this formulation "will always yield a pro-jurisdiction answer: Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do by other means if the independent contractor, subsidiary, or distributor did not exist." *Daimler*, 134 S. Ct. at 759 (citation and internal quotation marks omitted). All subsidiaries are "important" to their parent corporations, but that fact says nothing about whether the parent is "at home" in a state where the subsidiary operates.

Having relied on the Ninth Circuit's opinion in its original brief, GoldenTree now maintains (without acknowledging its own implicit indictment of its prior reliance on the case) that "it is not surprising that the Supreme Court reversed the Ninth Circuit's decision" because its view of general jurisdiction was overly expansive. Dkt. 58 at 2. GoldenTree now seeks to distinguish its brand of "agency" jurisdiction from the "peculiar" brand the Court rejected in *Daimler* by arguing that the contacts that the Illinois subsidiaries have with Illinois make them "at home" in Illinois. GoldenTree states that both subsidiaries have their principal places of business here, S+B USA is incorporated here, and both are "essential components of S+B's operations." *Id.* at 2-3. "Finkl and S+B USA," GoldenTree therefore maintains, "have the precise 'continuous and systematic' contacts in Illinois that – unlike MBUSA [Daimler's U.S.

distributor] in California – render them 'at home' in Illinois. Contrary to California in *Daimler*, Illinois is a 'paradigm all-purpose forum' for Finkl and S+B USA." Dkt. 58 at 2 (quoting *Daimler*, 134 S. Ct. at 760).

But the question is not whether Illinois is an "all-purpose forum" for the Illinois *subsidiaries*; it is whether the state can exercise jurisdiction over suits against S+B AG, the foreign parent corporation, or S+B Luxembourg, a foreign corporation that has no subsidiaries, arising from events that have no connection to Illinois. In focusing on the forum contacts of the Illinois subsidiaries, GoldenTree misses the entire point of the Court's decision in *Daimler*: general jurisdiction over the parent corporation must be predicated on an analysis of whether the *parent* corporation's affiliations with the forum state as so systematic and continuous as to make the *parent*—not the subsidiaries—at home in the forum state. Indeed, in *Daimler*, the Court assumed that MBUSA was "at home" in California and also assumed that all of MBUSA's contacts with California were imputable to Daimler (*i.e.*, that MBUSA was Daimler's agent in California), yet it concluded that Daimler's contacts with the state were nevertheless "slim" and far from sufficient to make Daimler "at home" in California. 134 S. Ct. at 760.

It is true enough, as GoldenTree argues, that *Daimler* does not categorically reject all possibility that general jurisdiction could be founded on an agency relationship, but leaving that door open a crack did not provide an opening sufficient for GoldenTree to enter. While acknowledging that agencies "come in many sizes and shapes," the Court firmly rejected the "sprawling" test of agency that GoldenTree (like the plaintiffs in *Daimler*) advances, namely whether the subsidiary performs activities that a parent corporation would otherwise perform itself. *Id.* at 759-60. Whether based on a subsidiary's activities or its own, to provide a court in the forum state with general personal jurisdiction over a foreign corporation, the corporation's

affiliation with the forum state must be "comparable to a domestic enterprise in that State." *Id.* at 758 n.11. And the Court made clear that this means that in all but the "exceptional" case, general jurisdiction over a corporation is limited to its place of incorporation or principal place of business. *Id.* at 761 n.19. And what was the example of an "exceptional" case provided by the Court? *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), where a world war forced a company to temporarily relocate its principal place of business to the United States due to enemy activity abroad.[5]

There is no similarly compelling case to be made for the exercise of general jurisdiction in this case.[6] The S+B defendants are not registered or licensed to do business in Illinois and do not themselves conduct business in Illinois; they do not maintain any offices, employees, or even a phone listing in Illinois. They have no bank accounts or other assets or direct investments in Illinois. They do not advertise in Illinois, they have not entered into or performed any contracts in or relating to Illinois, and they do not lease or own property in Illinois. They have never been required to pay Illinois income taxes or franchise fees or any other state taxes. They have never commenced any suit in any court in Illinois and have no agent authorized to receive service of process in this state.

---

[5] *Perkins* arguably is not even an exception to the rule, since the company was sued in the jurisdiction (Ohio) to which it had relocated its principal place of business during the war. *See* 342 U.S. at 447-48. It was, at the time, "at home" in Ohio because that is where its primary business activities were being conducted.

[6] The facts in this paragraph are all set forth in the affidavit of S+B's General Counsel, Christian Otto. *See* Dkt. 33-3. GoldenTree asserts in its brief that the Otto affidavit is "inaccurate," Dkt. 39 at 15-16, but it has not proffered contrary *evidence*. And to the extent that Otto's affidavit contradicts any of the allegations in GoldenTree's Complaint, GoldenTree cannot stand on its pleadings. *See GCIU-Emp'r Ret. v. GoldFarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009) ("[W]e accept as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff."). In response to a motion to dismiss supported by affidavits, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Research Found. v. Sanofi-Syntheloabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003).

Plainly, neither defendant is "comparable to" a domestic enterprise based on its own activities and, as noted, the fact that the Illinois subsidiaries are important to S+B's bottom line does not suffice to confer general jurisdiction over S+B.[7] GoldenTree tries to establish that the ties between the S+B defendants and the Illinois subsidiaries are closer than were the ties between Daimler and MBUSA, but its analysis in that regard is flawed and in any event unavailing.[8] The relevant question is whether GoldenTree has established that the S+B defendants should be regarded as "comparable to a domestic enterprise." The facts here establish only that a small portion of S+B's global business is conducted in Illinois, not that they have in any way adopted this state as a surrogate, de facto, or temporary home.[9] There are no allegations that any degree of management of the other 95-plus percent of S+B AG's business is conducted by or through the Illinois subsidiaries. "The activities of [the S+B defendants] are not now, and never have been, controlled by persons or entities located in Illinois." Dkt. 33-3 at ¶ 17. Thus, there is simply no basis to infer that S+B AG has in any way sought to make Illinois the base of

---

[7] With respect to the relative "importance" of the subsidiaries in the two cases, the Court notes that the subsidiaries in both cases made comparable contributions to the parent's total revenues: MBUSA's activities in California accounted for 2.4 percent of Daimler's worldwide sales and the Illinois subsidiaries appear to have contributed between 4 and 5 percent of S+B AG's total revenues. Again, the Court rejected such a test in *Daimler*, but even had it endorsed such a test, there is little basis to conclude that the Illinois subsidiaries are substantially more important to S+B than MBUSA was to Daimler.

[8] GoldenTree maintains that, unlike MBUSA, the Illinois subsidiaries are "direct" subsidiaries of S+B AG; the uncontradicted Otto affidavit, however, establishes that S+B Luxembourg is, like MBUSA, an indirect subsidiary. *See* Dkt. 33-3 at ¶ 4. One of the Illinois subsidiaries moreover, was, like MBUSA, incorporated in Delaware. *See id.* ¶ 5.

[9] GoldenTree has expressly disavowed any claim that there is any basis to pierce the corporate veil of the Illinois subsidiaries. Dkt. 39 at 10 (identifying veil piercing and agency as potential bases for exercising general personal jurisdiction but arguing only that GoldenTree has "satisfied the second method of establishing jurisdiction over a foreign parent, the 'agency theory of general jurisdiction'"); *id.* at 13 ("S+B . . . responds primarily to a 'veil-piercing theory' of jurisdiction that GoldenTree does not advance . . . .").

its business-wide operations. Accordingly, this Court lacks general personal jurisdiction over the S+B defendants.

### B. Forum Non Conveniens[10]

Under the doctrine of *forum non conveniens*, a court has the discretion to dismiss a case over which it normally has jurisdiction if in doing so "it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 802 (7th Cir. 1997). Two conditions must be met under the doctrine of *forum non conveniens*: (1) there must exist an alternative forum that has jurisdiction over the case that is both available and adequate, and (2) the balance of relevant private and public interests must weigh in favor of dismissal. *See Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008). Dismissal is proper if the chosen forum would impose "oppressiveness and vexation to a defendant" that is "out of all proportion to plaintiff's convenience." *Id.* (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007)) (internal quotation marks omitted).[11]

The defendants argue that Germany—where most of the S+B AG directors and officers involved in the offering reside—is the more appropriate forum for this case. A proposed alternative forum is considered available if "all of the parties are amenable to process and are within the forum's jurisdiction." *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009) (citing *Kamel*, 108 F.3d at 803). GoldenTree does not dispute that Germany is an available alternative forum, nor could it. It consented to German jurisdiction over

---

[10] The Court addresses the *forum non conveniens* issue because it pertains to defendant BNP as well as to the S+B defendants. With respect to the S+B defendants, the dismissal for *forum non conveniens* is an alternative holding.

[11] In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), the Court left open the question of whether state or federal law of *forum non conveniens* applies in a diversity case like this one. *See id.* at 249 n.13 (1981). The parties have not suggested that there is any substantive difference between federal and state *forum non conveniens* law, so the question need not be resolved here.

disputes arising from the offering transaction in a forum selection clause in the purchase agreement for the Notes. The defendants also consent to jurisdiction there.

GoldenTree does, however, dispute whether Germany is an adequate forum. A forum is adequate if "it provides the plaintiff with a fair hearing to obtain some remedy for the alleged wrong." *Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 421 (citing *Kamel*, 108 F.3d at 803). "Adequacy" does not require "equivalency," however. The forum's legal remedies need not be "as comprehensive or as favorable as the claims a plaintiff might bring in an American court." *Id.* "Instead, the test is whether the forum provides some potential avenue for redress for the subject matter of the dispute." *Id.* A forum is inadequate only if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *In re Factor VIII or IX Concentrate Blood Products Litig.*, 484 F.3d 951, 956 (7th Cir. 2007) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)) (internal quotation marks omitted). The doctrine is not meant to trigger complex comparisons of procedural and substantive law to ensure congruent remedies; indeed the Supreme Court has stated that it "is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper*, 454 U.S. at 251.

The primary argument that GoldenTree offers as to why Germany is an inadequate forum is that German limitations on discovery "make it virtually impossible" to pursue its claims against the S+B defendants there, despite the fact that (as GoldenTree concedes) German courts recognize fraud claims. *See* Dkt. 39 at 20. The Supreme Court effectively rejected that argument in *Piper*, where it noted that, among other advantages offered to plaintiffs by American law, "discovery is more extensive in American than in foreign courts," but held that such restrictions may not be accorded substantial weight in the *forum non conveniens* analysis. 454 U.S. at 247, 252 & n.18. Consistent with *Piper*'s teaching, myriad courts in this district and elsewhere have

rejected similar challenges to the adequacy of German courts. *See, e.g.*, *Wasendorf v. DBH Brokerhaus AG*, No. 04 C 1904, 2004 WL 2872763, at *6 (N.D. Ill. Dec. 13, 2004) (rejecting the argument that differences in the discovery process in Germany render German courts inadequate); *Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 928-29 (N.D. Ill. 1999) (rejecting the argument that German courts "allow little, if any, discovery"); *see also, e.g.*, *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1352-53 (1st Cir. 1992) ("[A]n alternative forum ordinarily is not considered 'inadequate' merely because its courts afford different or less generous discovery procedures than are available under American rules."); *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991) (finding that the district court did not abuse its discretion in finding Japanese forum adequate although discovery procedures were "not identical to those in the United States"); *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667(NRB), 2006 WL 3247363, at *6 (S.D.N.Y. Nov. 8, 2006) (rejecting the argument that restrictive discovery process in Germany renders German courts inadequate); *Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774 MMM (CWx), 2006 WL 4749756, at *9-10 (C.D. Cal. Sept. 5, 2006) (finding Germany an adequate forum despite its "significantly more limited" discovery procedures); *Fagan v. Deutsche Bundesbank*, 438 F. Supp. 2d 376, 383 (S.D.N.Y. 2006) (rejecting the argument that Germany's different discovery procedures rendered it an inadequate forum); *Bonzel v. Pfizer, Inc.*, No. CIV.04-1401 ADM/SRN, 2004 WL 2475564, at *9 (D. Minn. Nov. 2, 2004) (finding Germany an adequate forum despite its less liberal discovery process), *aff'd*, 439 F.3d 1358 (Fed. Cir. 2006).

GoldenTree does not identify a single case in which the limitations on discovery in Germany have been found to render German courts inadequate as an alternative forum. Indeed, it does not identify a single case in which German courts have been found to be inadequate for *any*

reason. To the contrary, Germany is among the 13 nations whose courts have been consistently deemed to be adequate alternative fora. *See Windt v. Qwest Commc'ns Int'l, Inc.*, 544 F. Supp. 2d 409, 418 (D.N.J. 2008) (citing Tom McNamara, *International Forum Selection and Forum Non Conveniens*, 34 Int'l Law 558, 560-61 (2000)), *aff'd*, 529 F.3d 183 (3d Cir. 2008). Nor does GoldenTree offer any compelling reason for this Court to reach the unprecedented conclusion that German courts are not an adequate alternative forum. Germany offers remedies for the types of claims that are generally at issue in this case. GoldenTree's expert, Sascha Kuhn, indicates that the defendants' board members may not be required to testify in their individual capacities in a case in which the company is a party, but Kuhn acknowledges that they may be required to do so as representatives of the company. Dkt. 40 at ¶ 19. The most significant restriction on the ability to obtain their testimony, in Kuhn's view, is that they cannot be compelled to respond to questions if their answers would subject them to the risk of criminal prosecution; that, of course, is a restriction that applies in American law as well. Consistent with the substantial weight of precedent, this Court concludes that Germany is an adequate alternative forum.

In balancing the private and public interests implicated by the location of the forum for this dispute, the Court first notes that defendants normally bear a heavy burden in opposing to the plaintiff's forum choice, especially if the plaintiff chooses the plaintiff's home forum. *See Sinochem,* 549 U.S at 430. In this case, U.S. company GoldenTree has chosen to litigate in the United States. This choice would normally be given substantial deference. But the Seventh Circuit has noted that "given the ever-expanding realm of international commerce, many courts have somewhat discounted a plaintiff's United States citizenship when that plaintiff is an American corporation with extensive foreign business and it brings an action for an injury occurring in a foreign country." *Kamel*, 108 F.3d at 804 (citing *Reid–Walen v. Hansen*, 933 F.2d

1390, 1400 (8th Cir. 1991)). GoldenTree plainly qualifies as an "expansive global operation." It has offices in New York and is incorporated in Delaware, but it also operates in international offices throughout Europe. The scope of GoldenTree's international presence strains the understanding of the United States as the only possible "home" forum. The maxim that counsels in favor of GoldenTree's choice of forum therefore carries less weight here.

GoldenTree's decision to sue in Illinois, rather than in one of its own home states, also further dilutes the deference ordinarily accorded to the plaintiff's choice of forum. While some courts have opined that, in the context of a *forum non conveniens* analysis, it should not matter whether the plaintiff resides in the district in which the suit was filed (because regardless of the district, the plaintiff has still chosen to file in a U.S. court), that analysis ignores both the fact that *forum non conveniens* can be raised with respect to purely domestic cases (a corporation domiciled in another state is still a "foreign" corporation to Illinois) and the grounding of the doctrine in an assessment of the relative burdens of litigating in the chosen forum. That view would also provide a plaintiff with a license to forum shop throughout the courts of the United States. As the Seventh Circuit noted in *In re Factor VIII*, when a plaintiff sues outside its own home forum, "the risk that the chosen forum really has little connection to the litigation is greater. . . . [This is] a practical observation about convenience. A citizen of Texas who decided to sue in the federal court in Alaska might face [a] skeptical court . . . ." 484 F.3d at 956. The gulf between New York and Chicago is not so great as that between Texas and Alaska (speaking geographically, anyway), but skepticism about the role "convenience" played in the plaintiff's choice of a forum that has no connection whatsoever to the substantive events at issue in the law suit is well warranted.

The private interest factors to be balanced include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 425 (quoting *Clerides*, 534 F.3d at 628) (internal quotation marks omitted). GoldenTree concedes that this case will pose evidentiary challenges regardless of jurisdiction; its principal argument regarding the balance of private interests is no more than a refrain of its argument about adequacy: German courts permit less discovery and therefore access to proof will be more restricted and more difficult. That argument has already been rejected as a basis for denying a *forum non conveniens* motion.

S+B contends, and the Court agrees, that most significant in balancing private interests is the attendance of witnesses. *See Interpane Coatings, Inc. v. Australia & New Zealand Banking Group, Ltd.*, 732 F. Supp. 909, 916 (N.D. Ill. 1990). That many potential witnesses are employees of one party or another would normally suggest less difficulty in compelling corporate witnesses to testify. *See Rotec Indus. Inc. v. Aecon Grp., Inc.*, 436 F. Supp. 2d 931, 935 (N.D. Ill. 2006) (noting that the defendant employer should be able to secure the cooperation and attendance of employee witnesses). Here, though, *most* potential witnesses appear to reside in Europe. All of the S+B AG board members reside in Europe; four of the eight board members reside in Germany. Other potential witnesses who prepared the marketing materials used to advertise the offering also reside in Europe. By contrast, only Burke, GoldenTree's New York representative (and perhaps a handful of others with whom he worked in New York, though GoldenTree does not identify any others who would be likely witnesses), resides in the United States, presumably in the New York metropolitan area; not one witness, it appears, resides in this

district. Thus, it appears that there are likely to be substantially more witnesses from Germany, specifically, and from Europe, generally, than there will be from New York; even if party employees could be compelled to testify in this case, convenience and cost factors would weigh in favor of a German forum. This is all the more true because this is a fraud case in which intent and knowledge are likely to be critical issues—issues that are best evaluated on the basis of live testimony. *See, e.g.*, *Interpane Coatings,* 732 F. Supp. at 916. GoldenTree's argument that most witnesses would be deposed in Europe rather than testifying in Illinois is therefore unpersuasive to the extent that it posits that deposition testimony suffices as a substitute for live testimony.

Tilting the balance even more decisively toward Germany is the fact that among the most critical witnesses in this case—potentially the most critical—will be Niemeyer and Euchner, the deposed CEO and CFO of defendant S+B AG. These key non-party witnesses reside in Germany and cannot be compelled by this Court to appear in this case. It seems likely that there may be other significant non-party witnesses (*e.g.*, other former officers and employees of the defendants), as well.

German courts would have more witnesses closer at hand, and would have more witnesses whose attendance could be compelled, lessening the overall costs associated with travel for the purpose of any permissible discovery and pretrial proceedings as well as trial, and tipping this factor in favor of a forum in Germany. Trial in Chicago would therefore be substantially more burdensome and expensive. *See Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 425; *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 751 (7th Cir. 2008); *Clerides*, 534 F.3d at 629.

In an age of computerization, the relative availability of documentary evidence seems less important than it may previously have been, *see, e.g.*, *Lavoie v. Suncruz Casino Cruises,*

*LLC,* No. 4:08–cv–2183–RBH, 2009 WL 425815, at *5 (D.S.C. Feb. 18, 2009), but even in that regard the scale tips toward Germany, and away from Illinois—where *no* relevant documents can be found. Some documentary support for GoldenTree's fraud claim is located in Europe and some may be located in New York, but the evidence in New York relates to GoldenTree's due diligence and reliance; that evidence is in GoldenTree's possession and is readily available to GoldenTree without regard to the location of the forum for the litigation; the same goes for documents relating to the initial solicitation that occurred between BNP and GoldenTree's London office. More germane to the discussion, then, is the location of evidence relating to the defendants' internal decisionmaking, including offering materials, financial statements, and correspondence; that evidence is located primarily in S+B AG's German and Swiss offices. GoldenTree's fraud and misrepresentation claims hinge on S+B AB's knowledge of its board's termination plan while the Notes were being marketed, so that evidence—most of which the defendants note will be in German—is important. The location of that evidence and the likelihood that such evidence will be in German weighs in favor of Germany as the forum. *See Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 425 (affirming dismissal where translation of relevant documents would be costly); *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 836 (5th Cir. 1993) (affirming dismissal where translation of documents from German to English would create language problems).

Weighing the private factors that are relevant to this case, then, a forum in Germany would ease access to proof, decrease costs, and do more to ensure the availability of witnesses whose testimony appears to be most important to these claims. Evaluation of the public factors relevant to the *forum non conveniens* inquiry tilts the scale even more decisively in favor of Germany and away from Illinois. The public interest factors to be balanced include

"administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 425 (quoting *Clerides*, 534 F.3d at 628).

Most clearly favoring dismissal is the local interest factor. Public interests weigh in favor of not unduly burdening Chicago-area citizens with jury duty for a case entirely unrelated to their home forum. *See id.* at 425. There is no localized controversy here: the foreign defendants solicited the London GoldenTree office to purchase bonds; a New York GoldenTree representative was involved in the communication and decisions leading up to the ultimate purchase of those bonds; GoldenTree has identified no resident of Illinois who played any role whatsoever in the events at issue in this case. A similar situation was presented in *Tkachyov*, in which another court in this district determined that there was not a local interest in Illinois in providing a forum for fraud claims asserted by New York residents against foreign holding companies. *See Tkachyov v. Levin*, No. 98C3120, 1999 WL 782070, at *8 (N.D. Ill. Sept. 27, 1999). So, too, here; no Illinois residents were involved with the alleged misrepresentation, the Notes offering, or any communications relevant to the claims in this case here. The only remote connections to this state are S+B USA and A. Finkl, subsidiaries of S+B AG, which are among the guarantors of the Notes. This tangential relationship with this forum does not sway the balance of the factors in favor of retaining the case. The Illinois subsidiaries are not parties to this case. They are not alleged to have engaged in any of the misconduct central to the claims, or

any conduct relevant to the claims at all, and GoldenTree has provided no basis to infer that the operations of the Illinois subsidiaries are threatened by this litigation.

Choice of law considerations also favor a forum in Germany. The defendants contend that this case will ultimately involve the application of German law. The Offering Memorandum and Note state that German law will govern Notes-related claims, and the defendants characterize GoldenTree's claims as seeking to make an end-run around the conditions of issue by seeking the remedy of rescission.[12] GoldenTree disputes that assertion, arguing that the law governing fraud claims is not set by the terms that the defendants cite because such claims do not involve the "rights and duties" of the Notes holders. It argues that the law of New York, as the place of injury, should apply to this action. It is true that place of injury is usually a significant choice of law factor in a tort case, but the Restatement (Second) of Conflict of Laws (which Illinois follows, *see Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 211, 835 N.E.2d 801, 867 (2005)), makes clear that where the injury is pecuniary loss, "the place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation." Restatement (Second) of Conflict of Laws § 148 cmt.c (1971). Further, as S+B argues, it is generally held that claims involving fraud in the formation of contract, as alleged here, "are subject to that contract's choice of law provisions." *Platinum Cmty. Bank v. Marshall Invs. Corp.*, No. 06 C 3544, 2008 WL 4866343, at *4 (N.D. Ill. July 29, 2008); *see also, e.g.*, *Custom Foam Works, Inc. v. Hydrotech Systems, Ltd.*, No. 09–cv–0710–MJR, 2011 WL 1102812, at *2-3 (S.D. Ill. 2011); *Amakua Development LLC v. Warner*, 411 F. Supp. 2d 941, 955-56 (N.D. Ill. 2006); *Janice Doty Unlimited, Inc. v. Stoecker*, 697 F. Supp. 1016, 1020

---

[12] The choice of law provision reads: "Applicable Law. The Notes, both as to formal content, as well as the rights and duties of the Holders, the Issuer, the Holders' Representative and the Paying Agent shall in all respects be determined in accordance with German Law."

(N.D. Ill. 1988). Thus, based on application of Illinois law, it appears that German law would apply to GoldenTree's claim and that factor favors a German court as the forum.

Finally, the Court resolves the parties' debate about the relative congestion of court dockets in favor of S+B and Germany. The defendants suggest that 81 percent of cases heard in district courts in Germany are resolved within 12 months in comparison to an average time of completion of 24.5 months in this district. GoldenTree suggests that such statistics cannot be relied upon to fairly compare the levels of congestion, and indeed it is common sense that the time of completion will always depend on the circumstances of a particular case, but in the absence of clairvoyance, courts in this circuit regularly use indicators such as median time to trial as a valid comparison tool. *See, e.g.*, *Clerides*, 534 F.3d at 630. The information provided by the defendants suggests that cases do move more quickly in Germany; while there may be many factors that account for this fact (including less expansive pretrial discovery), it is reasonable to infer that less congested court dockets may be one of them. This factor, too, favors Germany as the forum for this litigation.

The Court acknowledges an interest in allowing a wronged U.S. investor to seek relief in U.S. courts, but the localized interest here (whether defined as the Northern District of Illinois or the United States) is not compelling enough to win out, especially given the global stage on which GoldenTree was doing business and the other factors weighing in favor of dismissal.

*     *     *

For the foregoing reasons, the Court grants the S+B defendants' motion to dismiss [32] for lack of personal jurisdiction and, alternatively, on the basis of *forum non conveniens*. The Court grants BNP's motion to dismiss [30] on the basis of *forum non conveniens*.

Entered: August 20, 2014

John J. Tharp, Jr.
United States District Judge

28